**NATIONAL ADVERTISING CO., Plaintiff,**

v.

**CITY OF MIAMI, Defendant.**

**No. 01–3039–CIV.***

United States District Court, S.D. Florida. Miami Division.

Sept. 25, 2003.

---

* Case number 01–3039–CIV–KING and 02–20556–CIV–KING were consolidated under case number 01–3039–CIV–KING. For the sake of clarity, the Court has entered two (2) separate Orders that dispose of both cases in their entirety.

Thomas R. Julin, Esq., Hunton & Williams, Miami, FL, Counsel for Plaintiff.

Carol A. Licko, Esq., Hogan & Hartson, LLP, Miami, FL, Counsel for Defendant.

## MEMORANDUM OPINION GRANTING SUMMARY JUDGMENT

JAMES LAWRENCE KING, District Judge.

### I. Factual Background

Plaintiff National Advertising Company is a Delaware corporation and a wholly owned subsidiary of Viacom Outdoor Inc., a corporation formerly known as Infinity Outdoor, Inc. National is in the business of erecting and maintaining billboard signs on property it leases. National maintains both commercial and noncommercial messages on billboards that are located throughout the City of Miami.

The City of Miami adopted, thirteen years ago on March 8, 1990, a comprehensive Zoning Ordinance that is the subject matter of Plaintiff's First Amendment challenge to the constitutionality of the Ordinance. Ordinance No. 11,000[1] divided the City of Miami into 24 geographical areas and specified regulations applicable to property located within each area. The Ordinance precisely enumerated the specific public purposes and objectives the City intended and hoped to achieve through the enactment of Ordinance No. 11,000.[2] A grace period of five

---

1. Enacted pursuant to the Charter of the City, section 3(4), 14 and 72; and the Municipal Home Rule Powers Act of 1973, section 166.011 et seq., Florida Statutes, as amended.

2. The City's objectives as set forth in the Zon-

years was provided to Plaintiff, and any other nonconforming billboard or commercial advertising permit holders, with existing structures already erected within which to remove such billboards.[3]

National alleges that the Zoning Ordinance changed the City's zoning classifications, and these reclassified zones had the effect of making "some or all of the offsite signs in the effected zones [4] nonconforming with the Zoning Ordinance."[5]

With the five-year grace period protecting National's existing billboard structures, things remained relatively quiescent for the next ten years.

In April 2001, the City commenced to enforce the Zoning Ordinance by issuing notices to property owners on whose property National had erected billboard signs. The City notices advised the property owners that they were in violation of " 'Article (11) Sections 1107.2.2(a) [sic] Failure

---

ing Ordinance:
(1) To promote the public health, safety, morals, convenience, comfort, amenities, prosperity, and general welfare of the City;
(2) To provide a wholesome, serviceable, and attractive community;
(3) To increase the safety and security of home life;
(4) To preserve and create a more favorable environment in which to rear children;
(5) To stabilize and enhance property and civic values;
(6) To develop meaningful and productive relationships between the private sector and City government;
(7) To provides for a more uniformly just land use pattern and tax assessment base;
(8) To aid in development and redevelopment of the City;
(9) To increase traffic safety and ease transportation problems;
(10) To provide more adequately for vehicular parking, parks, parkways, recreation, schools, public buildings and facilities, housing, job opportunities, light, air, water, sewerage, sanitation, and other public requirements;
(11) To lessen congestion, disorder, and danger which often inhere in unplanned and unregulated urban development;
(12) To prevent overcrowding of land and undue concentration of population;
(13) To conserve and enhance the natural and man-made resources of the City; and
(14) To provide more reasonable and serviceable means and methods of protecting and safeguarding the economic and social structure upon which the good of all depends.
MIAMI, FLA., ZONING ORDINANCE § 120 (1991).

3. On or about March 28, 1991, pursuant to Ordinance No. 10863, the City amended the Zoning Ordinance to include a provision re-

quiring removal of nonconforming characteristics of use, which provides as follows:

In any district other than residential, any sign, billboard, or commercial advertising structure which constitutes a nonconforming characteristic of use may be continued, provided no structural alterations are made thereto subject to the following limitations on such continuance: (a) Any such sign except a roof sign shall be completely removed from the premises within five (5) years from the date it became nonconforming.

MIAMI, FLA., ZONING ORDINANCE § 1107.2.2(a) (1991). The Zoning Ordinance defines nonconforming characteristics of use as "including those where the nonconformity was created by ordinance adoption or amendment, as provided at section 1101.1, as well as those where nonconformity was created by public taking or court order, as provided at section 1101.2." Id. at § 1107.

4. For purposes of the instant case, National alleges it has billboard signs, or has attempted to obtain permits for signs, on property located in the following areas: (1) Restricted Commercial ("C–1"), (2) Liberal Commercial ("C–2"), (3) Central Business District ("CBD"), (4) Martin Luther King Boulevard Commercial District ("SD–1"), (5) Design Plaza Commercial–Residential District ("SD–8"), and (6) Latin Quarter Commercial–Residential and Residential District ("SD–14"). (01–3039–CIV Compl. ¶ 17; 02–20556–CIV Compl. ¶ 13.)

Except for one lease attached to the deposition of Vincent Carrozza, this voluminous record is unclear as to the validity or existence of the leases National claims to have with the property owners.

5. (Compl. 01–3039–CIV ¶ 28.)

to Completely Remove a Sign, Billboard, or a Commercial Advertisement from the Subject Property.'"[6] The property owners were told to correct the violations by various deadlines established throughout the month of May 2001, and that failure to do so could result in $500 per day fines, arrest, and closing their businesses, by the City's Code Enforcement Board.

The Miami City Commission, on July 10, 2001, authorized the City Manager to notice a meeting for July 19, 2001, at which the City Commission could make a finding that companies engaged in outdoor advertising in the City of Miami are notorious outstanding lawbreakers in order to justify its decision to authorize the removal of the billboards without notice, to hold outdoor advertising companies "in contempt of the City Commission, . . ."[7]

The City served over 100 property owners with summonses to appear before its Code Enforcement Board to respond to charges that the owners had failed to completely remove signs, billboards, or commercial advertisements from their property.

At the hearings[8], ten of the properties upon which Plaintiff's billboards were located were found to be in violation of the Ordinance and the signs were ordered removed.[9]

Exercising the appellate rights provided by the Zoning Ordinance, all ten property owners appealed the decisions of the City's Hearing Officers to the County Court in and for Dade County and thereafter, to the Eleventh Judicial Circuit Court of Florida.[10] That court, after the posting of an original appeal bond of $450,000 by Plaintiff granted a stay of the final orders requiring removal of the billboards until such time as the appeal in state court is decided by that court.

## II. Procedural Posture

### A. *National I*[11]

On July 11, 2001, in response to the

---

6. (Compl. 01–3039–CIV ¶ 32.)

7. (Compl. 01–3039–CIV ¶ 33.)

8. Hearings were held pursuant to the summonses on November 29, 2001; May 22, 2002; May 23, 2002; May 24, 2002; May 28, 2002; June 3, 2002; June 12, 2002; June 25, 2002; June 27, 2002; July 9, 2002; July 18, 2002; and July 22, 2002.

9. The hearing officers ordered as follows:

A. On June 6, 2002, Hearing Officer Kathryn Estevez ordered the following signs removed by June 20, 2002, and imposed a fine of $250 a day: (1) Tillman Wood, 1712 S.W. 1 Street; and (2) Vincent and Gloria Arias, 5741 West Flagler Street. (Mem. In Supp. Of Renewed Mot. For Prelim. Inj., 01–3039–CIV DE # 58, at 6.)

B. On July 19, 2002, Hearing Officer Jeffrey L. Allen ordered the following signs removed within sixty (60) days from the date of his order: (1) Jesus Vasquez, 2810 West Flagler Street; (2) Vincent Carrozza, 3528 West Flagler Street; (3) Luis Guerra, 3620 N.W.

7th Street; (4) Bartolome Calafell, 3411 N.W. 7th Street; (5) Lockport Investments, 219 N.W. 27th Street; (6) George's Service Station, 15 S.W. 17th Avenue; and (7) KC Crook, 2662 S.W. 27th Avenue. (*Id.*)

C. On August 5, 2002, Hearing Officer Marlon Hill ordered FEC Railway to remove the sign located on its property at 420 N.E. 79th Street within thirty (30) days of the date of his order, and threatened a $250 a day fine it is failed to comply. (*Id.*)

10. The appeals in the Florida Court have been consolidated and identified as *In re Matter of: City of Miami v. Vicente Arias and W. Gloria,* Case No.: 02–282 AP. Similarly, the appeals to the Circuit Court have been consolidated and identified as *Vicente Arias and W. Gloria v. City of Miami,* Case No.: 02–241 AP. (Mem. In Supp. of Renewed Mot. For Prelim. Inj., 01–3039–CIV DE # 58, at 6.) These appeals are still pending in State Court.

11. This cause is before the Court upon the parties' Second Cross–Motions for Summary Judgment, filed July 7, 2003. (DE ## 112, 116.) On July 24, 2003, Plaintiff National

City's enforcement proceedings against property owners with whom National had leases to erect and maintain billboards, National filed its three-count Complaint against the City in this Court[12] alleging that the Zoning Ordinance (1) discriminated in violation of the First Amendment and Equal Protection Clause, (2) lacked procedural safeguards in violation of the First Amendment, and (3) the City's decision to begin immediate removal of the signs without further notice or proceedings violated Due Process and the First Amendment.[13]

Three weeks later, National moved for injunctive relief to prevent "the City of Miami (1) from removing any signs owned, leased, or operated by National Advertising ..., (2) from enforcing the City's sign regulations against any persons or business entities during the pendency of this litigation, and (3) from imposing any fines or filing any liens in conjunction with enforcement of the City's sign regulations against owners of any property owned by or leased to National Advertising, its parents, affiliates, or subsidiaries."[14]

On August 23rd, 24th and September 20th, the Court held evidentiary hearings on National's motion. Plaintiff's Motion for Preliminary Injunction was denied pending exhaustion of National's administrative and appellate remedies guaranteed Plaintiff in the Zoning Ordinance.[15]

National appealed and the Eleventh Circuit issued its Mandate on National's appeal on November 26, 2002, vacating and remanding this Court's Order Denying Motion for Preliminary Injunction and stating that "[b]ecause the City summoned the property owners who lease the property to National, rather than National itself, National had no administrative remedies to exhaust."[16]

National filed an Amended Complaint against the City and Miami Dade County ("the County") on January 30, 2003, alleging new claims in addition to the three originally set forth in the Complaint: (1) the City's refusal to stay the accrual of code enforcement fines discriminates against National on the basis of its exercise of its First and Fourteenth Amendment rights to pursue litigation against the City, (2) the City and the County's discriminatory acts violate the First Amendment and the Equal Protection Clause, and (3) the City and the County's lack of procedural safeguards violate the First Amendment. Plaintiff sought another injunction on March 3rd of this year.

## B. *National II*

On February 21, 2002, National filed the case referred to as National II[17] in response to the City's rejection of the seven permit applications for commercial speech advertising billboards National submitted in December, 2001 and January, 2002.

---

Advertising ("National") and Defendant City of Miami ("the City") each filed their respective Responses. (DE ## 138, 140.) On August 1, 2003, both the City and National filed their respective Replies. (DE ## 146, 147.) Also pending before this Court is National's Renewed Motion for Preliminary Injunction, filed March 3, 2003. (DE # 56.) On April 7, 2003, the City filed its Response. (DE # 85.) On April 10, 2003, National filed its Reply. (DE # 88.)

12. *National Advertising Co. v. City of Miami,* Case No. 01–3039–CIV–KING (National I).

13. (Compl., 01–3039–CIV at 18–23.)

14. (Aug. 16, 2001, Emergency Mot. for Prelim. Injunct. at 1.)

15. (Sept. 21, 2001, Order, 01–3039–CIV DE # 31, at 4.)

16. *National Adv. v. City of Miami,* No. 01–15676 at 2, 48 Fed.Appx. 740 (11th Cir. Aug. 27, 2002) (unpublished opinion).

17. *National Advertising Co. v. City of Miami,* Case No. 02–20556–CIV–KING (National II), ——— F.Supp.2d ———.

One of the applications, subsequently re-submitted was granted by the City. On March 3, 2003, the parties filed Cross–Motions for Summary Judgment [18] relating to the factual allegations underlying National II. In an attempt to avoid confusion, those Cross–Motions for Summary Judgment are addressed and ruled upon by separate order.

### III. Overview of Arguments

In the Cross–Motions for Summary Judgment, both National and the City set forth various arguments as to why each is entitled to judgment as a matter of law. In its Motion, the City argues that this Court should enter summary judgment in its favor on the following grounds: (1) National's claims are not ripe because National has failed to show injury to its First Amendment rights or its advertisers' First Amendment rights; (2) National has no standing because National has no injury-in-fact, any injury National may have was not caused by the City, and National's claims are not redressable by this Court; and (3) National's claims are moot because the ordinance it is challenging has been amended and replaced in its entirety. In its Response, National argues that: (1) National's claims are ripe; (2) National has First Amendment injury; (3) this Court can redress National's claims; and (4) National's claims are not moot as a result of the City's amendment to the Ordinance.

On the other hand, in its Motion for Summary Judgment, National argues that it is entitled to summary judgment because: (1) the Ordinance abridges the First Amendment by a) discriminating on the basis of content against noncommercial speech, b) discriminating against different types of noncommercial speech, and c) favoring onsite commercial speech over offsite commercial speech; (2) the Ordinance

lacks procedural safeguards required for a speech licensing scheme; and (3) the unconstitutional provisions cannot be severed. In its Response, the City argues that National's Motion should be denied because (1) there are material facts in dispute, (2) the Court lacks subject matter jurisdiction, and (3) the Ordinance does not violate the First Amendment.

### IV. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). If the record as a whole could not lead a rational fact-finder to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). There is no requirement that the trial court make any findings of fact. *Id.* at 251, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir.1993). If the movant meets this burden, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exits. *Id.* To meet this burden, the non-moving party must go beyond the pleadings and "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Florida, Inc.,* 931 F.2d

---

18. (02–20556–CIV DE ## 44, 53.)

1472, 1477 (11th Cir.1991). If the evidence relied on is such that a reasonable jury could return a verdict in favor of the non-moving party, then the Court should refuse to grant summary judgment. *Hairston*, 9 F.3d at 919. A mere scintilla of evidence in support of the nonmoving party's position, however, is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the evidence is merely colorable or is not significantly probative, summary judgment is proper. *Id.* at 249–50, 106 S.Ct. 2505.

### V. Analysis

The spirit of the First Amendment is to "protect speech from the dangers of government censorship and to stop the government from suppressing the expression of ideas and public debate through the guise of regulation." *Granite State Outdoor Adver. v. City of Clearwater, Florida*, 213 F.Supp.2d 1312, 1333 (M.D.Fla.2002) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). In its protection of free speech, press and religion, the First Amendment embodies the ideals this country holds dearest to its national consciousness. Since its infancy, these principles have provided the bedrock of our democratic society. Being able to freely express ideas and opinions constitutes the heart of the American character. As such, courts fiercely protect these freedoms from even the slightest of erosion resulting from government intervention and legislation.

However, with every right comes a corresponding responsibility. A recurring issue in jurisprudential history concerns the Supreme Court's struggle to balance individual rights with the rights of society as a whole. THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 300–01 (Kermit L. Hall ed., 1992). Therefore, the courts play an essential role in drawing viable constitutional lines between government regulations and an individual's right to exercise his First Amendment freedoms. Nonetheless, plaintiffs must not be allowed to manipulate courts' visceral need to protect the First Amendment. Instead, courts must vigilantly reject arguments intended to pervert that Amendment's primary purpose.

This case presents a facial challenge on First Amendment grounds to a municipal zoning ordinance by a commercial billboard advertising company. The instant action represents yet another case in what seems to be an ever-increasing trend through which outdoor advertising companies facially challenge municipal ordinances seeking to strike down such ordinances as entirely void.[19] There have been

---

**19.** An interesting fact from these cases is that upon the district court's ruling, the adverse party appeals, and subsequently, the parties settle without the Eleventh Circuit issuing an opinion. For example, in *Wilton Manors Street Systems v. Wilton Manors*, No. 00–6186–CIV–UNGARO–BENAGES, 2000 WL 33912332 (S.D.Fla. Dec. 5, 2000), the court entered an order granting Plaintiff's Motion for Summary Judgment. That order was appealed and the appeal was dismissed as per the parties' Joint Motion to Dismiss. Similarly, in *Florida Outdoor Adver., LLC, v. Boynton Beach*, 182 F.Supp.2d 1201 (S.D.Fla.2001) (Middlebrooks, J.), the court entered an order granting Plaintiff's Motion for Summary Judgment. That order was appealed and later the appeal was dismissed because the parties settled. Then, in *Florida Outdoor Adver., LLC v. Boca Raton*, No. 01–8504–CIV–MIDDLEBROOKS (S.D.Fla. Jan.14, 2003), the district court entered summary judgment for the City, but the advertising company did not appeal. Finally, in *Coral Springs Street Systems, Inc. v. City of Sunrise*, No. 01–7951–CIV–ZLOCH, 2003 WL 22351111, —— F.Supp.2d —— (S.D.Fla. Feb.21, 2003), what seems to be the most recent billboard case, the parties appealed the district court's order granting Plaintiff's Motion for Summary Judgment. This case is, as far as this Court knows, still pending.

a series of cases by billboard companies across the Eleventh Circuit against municipal zoning ordinances raising the same facial challenges here asserted.[20] Through these actions, advertising companies transform the proverbial First Amendment shield, intended to protect noncommercial speech, into a sword that assures their commercial well-being. The following analysis presents an in-depth examination of the provisions challenged in this case to determine whether the City's Zoning Ordinance "create[s] an unacceptable threat to the 'profound national commitment .. that debate on public issues should be uninhibited, robust, and wide-open.' " *Members of the City Council v. Taxpayers for Vincent, et al.*, 466 U.S. 789, 817, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964)).

### A. *National's Standing to Assert First Amendment Challenge*

In the instant action, National alleges that Ordinance No. 11,000[21] is facially unconstitutional because it impermissibly infringes on the free speech rights of National and its advertisers as guaranteed by the First and Fourteenth Amendments. Specifically, National argues that the City's threat to remove some of National's billboards pursuant to its facially unconstitutional sign code constitutes First Amendment injury.[22] National further argues that this Court can redress its injury "[o]nly by striking the City's Sign Code in its entirety and enjoining its further enforcement." [23] In its cross-motion, the City argues that National lacks standing because: 1) National has no First Amendment injury because this case is about National's right to erect billboards wherever it wants, not speech; 2) any alleged injury was caused by National's refusal to relocate its billboards to areas of the City where they are allowed, not by the City; and 3) National's alleged injury is not redressable by the Court because even if the Court struck the provisions of the City's Ordinance as facially unconstitutional, National's billboards would still be illegal under the City's amended Ordinance and would have to be removed.[24]

Article III of the U.S. Constitution limits federal court jurisdiction to the consideration of actual cases and controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Part of this case or controversy requirement includes the doctrine of standing, which determines whether a plaintiff is the proper party to bring its claim before the court for adjudication.

---

**20.** Judges of the Southern District of Florida have rendered four decisions involving the same or similar billboard company challenges to city ordinances.

**21.** At the outset, this Court notes that at the time relevant to this case, the City of Miami did not have a sign code. (Tr. of Hr'g on Cross Mot.'s for Summ. J. at 34–40, 8/27/03.) What National alternatively calls the City's "Sign Code" or "Sign Ordinance" consists of numerous sections of nine (9) different Articles pulled from the City's Zoning Ordinance that regulate the use of outdoor signs and structures. (Pl.'s Notice of Filing, 01–3039–CIV DE # 94, at 4.) However, these nine (9) Articles are not individually codified as a sign code, but instead, are part and parcel of the City's comprehensive Zoning Ordinance. (*See* Tr. of Hr'g on Cross Mot.'s for Summ. J. at 35, 39–40, 8/27/03.) Thus, the Court will refer to the challenged provisions as the Zoning Ordinance.

**22.** (Pl.'s Mem. In Opp'n to Def.'s Mot. for Summ. J., 01–3039–CIV DE # 138, at 11.)

**23.** (Pl.'s Mem. In Opp'n to Def.'s. Mot. for Summ. J., 01–3039–CIV DE # 138, at 2, 14; *see also* Pl.'s Mem. in Support of Mot. for Summ. J., 01–3039–CIV DE # 117, at 18.)

**24.** (Def.'s Mem. in Supp. of Summ. J., 01–3039–CIV DE # 112, at 13–17.)

*Id.* at 560, 112 S.Ct. 2130; *see also* Erwin Chemerinsky, *Federal Jurisdiction* 56 (3rd ed.1999). In *Baker v. Carr*, the Supreme Court cautioned that a plaintiff who is challenging the constitutionality of a state or federal law must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Thus, in order to have standing, a plaintiff must prove that: 1) it has sustained an injury "of a legally protected interest;" 2) a "causal connection [exists] between the injury and the conduct complained of;" and 3) the injury is capable of being redressed by the court. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (citations omitted). Moreover, the plaintiff's injury must be "concrete and particularized, and actual or imminent, not conjectural or hypothetical." *Id.* at 560, 112 S.Ct. 2130.

■■■■ However, under the overbreadth doctrine, the Supreme Court has created a limited exception to traditional Article III standing requirements to allow a plaintiff to challenge the "facial validity of a statute on the grounds of its substantial infringement of the First Amendment interests of others" not before the court. *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 505 n. 11, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); *see also Taxpayers for Vincent*, 466 U.S. at 799, 104 S.Ct. 2118. This exception is based on the determination that "First Amendment interests are fragile interests, and. the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted." *Bates v. State Bar of Arizona*, 433 U.S. 350, 381, 97

S.Ct. 2691, 53 L.Ed.2d 810 (1977). Yet there is always a risk that this exception to the otherwise stringent traditional standing requirements will swallow the general rule. *Taxpayers for Vincent*, 466 U.S. at 799, 104 S.Ct. 2118. Accordingly, the Supreme Court has cautioned that the overbreadth doctrine is "manifestly[ ] strong medicine. employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Therefore, to allow a plaintiff to attack an otherwise legitimate statute on facial overbreadth grounds, particularly where the statute's purpose is to regulate conduct and not speech, the overbreadth must be "not only real but *substantial* as well," such that there is "a *realistic danger* that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Taxpayers for Vincent*, 466 U.S. at 799–801, 104 S.Ct. 2118 (emphasis added). The overbreadth doctrine did not, however, "create any exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court." *Id.* at 798, 104 S.Ct. 2118. Thus, the Supreme Court has permitted a commercial billboard company to assert a facial overbreadth challenge to an ordinance only where the company also engaged in a *"substantial amount* of noncommercial advertising." *Metromedia*, 453 U.S. at 504, 101 S.Ct. 2882 (emphasis added).

National Advertising, in this case has, by its own estimate a *de minimis* noncommercial interest. It is an outdoor billboard company publishing commercial advertising on 98% of its structures.[25]

---

**25.** In National Advertising II, the seven permit applications filed by Plaintiff were for commercial billboards. No mention was made (in the permit application) for Plaintiff's intent to publish noncommercial speech.

**1.** ***National has standing to challenge the provisions of the Ordinance relating to commercial speech***

■ Because National's interests in this case are overwhelmingly commercial[26], National's standing to challenge provisions of the Ordinance that affect commercial as opposed to noncommercial speech will be examined separately. With regard to commercial speech, National has demonstrated particularized, imminent injury, traceable to the City's conduct, which can be redressed by the Court. National is a commercial, for-profit billboard advertising company, and a wholly owned subsidiary of the largest advertising company in the United States, Canada, and Mexico.[27] National currently has billboards standing in the City of Miami that, but for the City's Zoning Ordinance, are presumably there legally.[28] The City has threatened removal of National's billboards under the Ordinance and has begun enforcement proceedings against property owners to have some of National's billboards removed. Moreover, this Court has the power to strike and enjoin enforcement of any provisions of the Ordinance found to be un-

constitutional. Therefore, this Court finds that National has Article III standing to challenge those provisions of the City's Zoning Ordinance that restrict commercial speech.

**2.** ***National does not have standing to challenge the provisions of the Ordinance that do not relate to noncommercial speech***

■ National's standing, under the overbreadth exception to challenge those provisions of the Zoning Ordinance that allegedly unconstitutionally restrict noncommercial speech is a more difficult question.[29] After careful consideration, this Court concludes that National does not have the required substantial interest in noncommercial speech to have any standing to assert challenges on behalf of noncommercial advertisers (if any there be) to the noncommercial provisions of the Zoning Ordinance.

First, the purpose of the City's Zoning Ordinance, like most municipal zoning ordinances, is to regulate land use within the City of Miami to avoid "unplanned and unregulated urban development."[30] More specifically, the approximately 800-page

---

**26.** According to Joseph H. Little, Director of Real Estate in the Southeast for Viacom Outdoor, Inc., noncommercial messages displayed on National's billboards represent approximately 2% of National's total advertising. (Aug. 28, 2002, Tr. of Prelim. Inj. Hr'g at 23:3–13.) Thus, the remaining 98% of National's advertising consists of commercial messages displayed on billboards located throughout the City of Miami.

**27.** (01–3039–CIV Am. Compl. ¶ 4.)

**28.** The record is unclear as to the validity or existence of the leases National claims to have with property owners at issue in this case. The parties have had a full opportunity to develop, in the discovery and pleading practice phase of this case the validity, or indeed even the existence of, leases National claims to have with property owners it purports to represent in this case. The Plaintiff, at a

minimum, must show that it either owns or leases some or all of the approximate 100 billboard sign locations for which the City has issued summonses to the owners of the property as being in violation of the City's Zoning Ordinance No. 11,000.

**29.** Judge Moody succinctly stated that "[t]he overbreadth doctrine is referred to frequently, yet it remains little understood and a source of much confusion." *Granite State Outdoor Adver.*, 213 F.Supp.2d at 1321 n. 11 (citing Hill, Alfred, "The Puzzling First Amendment Overbreadth Doctrine," 25 Hofstra L.Rev. 1063 (Summer 1997); Fallon, Jr., Richard H., "Making Sense of Overbreadth," 100 Yale L.J. 853 (Jan.1991)).

**30.** MIAMI, FLA., ZONING ORDINANCE § 120 (1991).

Zoning Ordinance divides the city into different districts and regulates everything from the height of buildings, to the construction and location of billboards, signs, and other structures, the construction and location of parking lots, the use of water, and the occupancy rates of dwelling units.[31] Since the purpose of the City's Ordinance is to regulate conduct, not speech, it is unlikely that the overbreadth challenge has any relevancy at all to this case.

Second, National has failed to demonstrate the kind of "substantial overbreadth" contemplated by the Supreme Court that would justify application of the exception in this case. In *Taxpayers for Vincent*, the Supreme Court reiterated that "'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" 466 U.S. at 800, 104 S.Ct. 2118 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). In *Bates*, the Supreme Court further stated that "justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context. . . .' Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation." 433 U.S. at 380–81, 97 S.Ct. 2691. Finally, in *Broadrick*, eight justices agreed that an over-breadth challenge should not be entertained in every First Amendment case,[32] and the Court concluded that the overbreadth exception, "a limited one at the outset," becomes less justified as the behavior sought to be regulated "moves from 'pure speech' toward conduct." 413 U.S. at 615, 93 S.Ct. 2908.

Here, National has been engaged in billboard advertising in the City of Miami for approximately forty years,[33] yet Plaintiff has not presented this Court with a single instance where the City has ever infringed on anyone's noncommercial free speech rights.[34] Thus, National has sustained no injury with regard to its noncommercial speech rights, nor has it demonstrated any "realistic danger" that the Ordinance's very existence threatens the First Amendment rights of others not before the Court. In fact, the Ordinance National is challenging has been amended and is no longer in effect.[35] While this Court recognizes that a city cannot escape overbreadth review simply by amending its Ordinance,[36] the Court finds it illogical to extend the limited overbreadth doctrine to an Ordinance that cannot chill any speech in the future, and, by all accounts, has not chilled any in the past. There is simply no reason to think that National's interests in any way parallel those of noncommercial speakers,[37] and this Court hesitates to facially invalidate a zoning ordinance, enacted by the elected officials of the City of Miami to regulate

31. *See, e.g.', Id.* at §§ 200, 210, and 220.

32. *Metromedia*, 453 U.S. at 547, 101 S.Ct. 2882 (Stevens, J., dissenting). This Court notes that Justice Stevens wrote the majority opinion in *Taxpayers for Vincent* only four (4) years after dissenting in *Metromedia* and discusses standing and the overbreadth doctrine extensively in both opinions. Therefore, this Court gives his dissenting opinion in *Metromedia* great weight.

33. (01–3039–CIV Am. Compl. ¶ 9.)

34. Despite the voluminous record in this case, National has not produced any testimony nor a single affidavit of anyone attesting to a situation in which he or she petitioned to put up a noncommercial message and the City deprived them of that right. On the contrary, the Court finds that the record is replete with evidence that National's *sole interest* is in erecting commercial billboards wherever it chooses throughout the City in order to ensure its commercial well-being.

35. National has not challenged the City's amended Ordinance in this litigation.

36. *See Massachusetts v. Oakes*, 491 U.S. 576, 586–87, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989).

37. *Compare Metromedia*, 453 U.S. at 548, 101 S.Ct. 2882 (Stevens, J., dissenting) (stating

the use of land in that city, based on mere prediction and speculation.[38] "[U]nder our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws,"[39] and this Court will not presume to do so here.

Finally, this Court does not read *Metromedia* to stand for the proposition that a plaintiff with a *de minimis* interest in noncommercial speech may facially challenge an ordinance raising the noncommercial speech interests of third parties who have not shown any injury and who are not before the Court. Interestingly, however, four out of five of National's First Amendment challenges to the City's Zoning Ordinance are on behalf of noncommercial speech interests. Specifically, National's Complaint alleges that the Ordinance discriminates:

> a. Against *noncommercial speech* on the basis of content by allowing on-site commercial outdoor advertising signs while prohibiting non-commercial outdoor advertising signs at the same sites.
> b. Against *noncommercial speech* on the basis of content by prohibiting non-commercial signs generally, but allowing some noncommercial signs.
> c. Against *noncommercial speech* on the basis of content by exempting some noncommercial signs from licensing altogether.
> d. Against *noncommercial speech* on the basis of content by imposing more restrictive size, height, and spacing requirements on some noncommercial signs than on others on the basis of content.
> e. Against *commercial offsite signs* by banning most such signs.
> f. Against all signs on the basis of the zone in which they are located.[40]

In the instant case, National's Vice President, Joseph H. Little, testified that National's billboard displays are "largely commercial," and noncommercial advertising constitutes only "[p]erhaps two percent" of National's total advertising budget.[41] Even if two percent of National's billboards in the City of Miami contain noncommercial messages, this Court concludes that two percent does not constitute a "substantial amount," as mandated as an absolute prerequisite to invoking the overbreadth exception.[42] National's counsel relies heavily upon the little understood footnote from the plurality opinion in *Me-*

---

that the interests of onsite advertisers do not necessarily parallel the interests of commercial offsite billboard advertisers).

**38.** *See id.* at 547, 101 S.Ct. 2882 (Stevens, J., dissenting) (stating that while overbroad legislation "may deter protected speech to some unknown extent, there comes a point where that effect at best a prediction cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe").

**39.** *Id.* at 546, 101 S.Ct. 2882 (Stevens, J., dissenting) (discussing standing and the overbreadth doctrine).

**40.** (01–3039–CIV ¶ 67(a)-(f).)

**41.** (Tr. Of Prelim. Inj. Hr'g. at 23; 7, 10, 8/28/2002.)

**42.** At oral argument, the following exchange occurred between the Court and National's attorney:

> Mr. Julin: Our client has standing, like *Metromedia*, because we*Metromedia* had two percent of its signs used for noncommercial speech.
> Court: Is that in the opinion-
> Mr. Julin: Yes, it is. It is in the opinion.
> Court: -in the *Metromedia* opinion? It's not in the Supreme Court of California opinion or anywhere else? That's somewhere in the opinion, two percent?
> Mr. Julin: Yes.
> Court: I don't have any difficulty that it's that you have read it somewhere in the record.
> Mr. Julin: No, it's not in the record. It's actually referred to in the opinion.
> Court: I accept your word it's in there. Now, the Court there, you say, held that

*tromedia* holding: "we have never held that one with a 'commercial interest' in speech also cannot challenge the facial validity of a statute on the grounds of its substantial infringement of the First Amendment interest of others." 453 U.S. at 505 n. 11, 101 S.Ct. 2882. The doctrine of standing in First Amendment billboard cases is unclear at best. *See Lamar Adver. Co. v. City of Douglasville,* 254 F.Supp.2d 1321, 1327 n. 3 (N.D.Ga.2003) (citing numerous cases that note the uncertain state of the law in this area). Counsel's reading of this quoted footnote from *Metromedia* is a basis for his interpretation that even a *de minimis* two percent noncommercial speech publication by a commercial billboard advertising company gives National herein an almost absolute right to raise all the noncommercial First Amendment challenges to a city ordinance that would be otherwise available to noncommercial speakers. This is the authority, counsel urges, giving National the right to the overbreadth exception and the consequent noncommercial challenges National has raised.

It defies logic and all reasonable interpretation of the language of *Metromedia* referred to above (relied upon by National) where the Supreme Court has simply said that it has not yet determined that an entity with a commercial interest can *never* raise a First Amendment challenge to the facial validity of a statute, into a legal principal that even a slight (*de minimis*) interest in noncommercial speech by a overwhelmingly proportionate commercial speech billboard company thus giving it the right to take up the sword on behalf of noncommercial advertisers (if any) in the battles they fight to protect their commercial interests. Therefore, this Court finds that National cannot raise a facial overbreadth challenge to the City's Zoning Ordinance.

## B. *Content–Based v. Content–Neutral*

At the heart of this case lies the debate over whether the Zoning Ordinance at issue constitutes an impermissible content-based regulation, or a constitutionally sound content-neutral zoning regulation. National argues that the Zoning Ordinance is a facially unconstitutional content-based ordinance that cannot survive strict scrutiny as a result of provisions that favor (1) commercial over noncommercial speech;[43]

---

was a substantial, a substantial element of discrimination against noncommercial speech?
Mr. Julin: Yes.
Court: Is two percent, in your view, substantial?
Mr. Julin: It is substantial. Here is what they are saying. They are saying the city has made a determination that some content of noncommercial speech is going to be allowed, not only in certain areas, but in all the zones of the city there are these general exceptions for certain types of noncommercial speech.

*

Court: I just have difficulty with the concept, if the Supreme Court said that in that case, and I assume they did, that it's substantial. Two percent seems to me to be not substantial. 98 percent seems substantial. Two percent does not.
(Tr. of Hr'g. on Cross Mot.'s for Summ. J. at 96: 4, 97:10–14, 8/27/03.)
This Court diligently searched the *Metromedia* opinion and found no reference to two percent.

**43.** In support of this argument, National cites to the following Ordinance provisions:

| Code Section | Zone | Code Page | Nature |
|---|---|---|---|
| 401 | G/I | 119 | Onsite only. |
| 401 | C–1 | 129 | Onsite only. |
| 401 | CBD | 132.1 | Onsite only. |
| 401 | I | 130.9 & 132.4 | Onsite only. |
| 401 | RT | 137 | Point of sale; outdoor advertising. |

(2) some noncommercial over other noncommercial speech;[44] and (3) onsite commercial over offsite commercial speech.[45]

On the other hand, the City asserts that the Ordinance is simply a content-neutral zoning regulation intended to prevent the

| 601.4.1.2 | All | 178 | Plant nurseries; outdoor dining; etc. |
| 615.8 | SD–15 | 270 | Onsite only; not more than one half Of sign shall advertise subsidary products or services. |
| 616.11 | SD–16 | 280 | Same as 602.11; onsite; offsite prohibited. |
| 926.10.3 | All | 375 | Onsite signs not in use. |
| 926.15 | All | 376 | Outdoor advertising. |

(Pl.'s Notice of Filing, 01–3039–CIV DE # 94, at 5.)

**44.** In support of this argument, National cites to the following sections and argues as follows: (1) §§ 925.3.12 and 925.3.13 permit "political campaign signs connected to elections but prohibit[ ] political signs unrelated to elections;" (2) § 925.3.11 permits "civic campaign signs in the C–1 zone but not other noncommercial signs;" (3) § 925.3.19 allows "freestanding perimeter wall signs for identifying developments but not for political messages;" and (4) § 925.3 exempts "certain noncommercial signs (e.g. flags, real estate signs, election signs,) from the permitting process while imposing permit requirements on others." (Pl.'s Mem. In Supp. of Mot. for Summ. J., 01–3039–CIV DE # 117, at 8–9.)

National also identifies the following sections in further support of this argument: (1) § 401 at 98, 100, 102, 107, 111, 115, 119, 128, 103.3, 132.1, 180.9, and 137; (2) § 507 at 160; (3) § 602.11 at 186; (4) § 604.11 at 190; (5) § 605.11 at 202; (6) § 606.11 at 214; (7) § 606.11 at 214; (8) § 607.11 at 226; (9) § 607.11 at 226; (10) § 608.11 at 229; (11) § 609.11 at 230.2 (this Court could not identify this section in the copy of the Zoning Ordinance filed in this record); (12) § 611.11 at 235; (13) § 613.11 at 240; (14) § 614.3.8 at 246; (15) § 615.8 at 270; (16) § 616.11 at 280; (17) § 620.8 at 288.1; (18) § 622.11 at 294; (19) § 623.8; (20) § 625.8; (21) every subsection of § 925.3 at 368–372 (exempting the following signs from permit requirements: a) signs erected by or on order of governmental jurisdictions, b) national flags and flags of political subdivisions, c) decorative flags and other decorations for special occasions, d) symbolic flags and award flags, e) address and directional signs or warning signs, f) signs on vehicles, g) real estate signs, h) construction and development signs, I) balloons, j) signs posted on community or neighborhood bulletin signs and kiosks, k) temporary civic campaign signs, l) temporary political campaign signs, m) cornerstones and memorials, n) U.S. mailboxes, o) signs on bus shelters/benches or trash receptacles, p) weather flags, q) signs identifying churches, and r) freestanding perimeter wall signs identifying developments); (22) § 926.5.1 at 373; (23) § 926.9 at 374 (exempting signs of historic significance from permit requirements); (24) 926.10.3 at 375; (25) 926.12 at 376; (26) 926.15 at 376; (27) 926.16 at 378; (28) definitions of various words set forth in § 2502 at 683–720. (Pl.'s Notice of Filing Zoning Ordinance, Sign Code and Challenged Provisions, 01–3039–CIV DE # 94, at 5–7.)

**45.** In support of this argument, National cites to the following Ordinance provisions:

| Code Section | Code Page | Nature |
| --- | --- | --- |
| 401 | 119 | Onsite only. |
| 401 | 129 | Onsite only. |
| 401 | 132.1 | Onsite only. |
| 401 | 130.9 & 132.4 | Onsite only. |
| 401 | 137 | Point of sale; outdoor advertising. |
| 601.4.1.2 | 178 | Plant nurseries; outdoor dining; arts & crafts; Demonstrations; performances; flowers; plants & shrubs; objects of art; handicrafts; mass-produced items; produce & foods. |
| 615.8 | 270 | Onsite only; not more than one half of sign shall advertise subsidiary products or services. |
| 616.11 | 280 | Same as 602.11; onsite height; offsite prohibited. |
| 926.10.3 | 375 | Onsite signs not in use. |
| 926.15 | 376 | Outdoor advertising. |

(Pl.'s Notice of Filing Zoning Ordinance, Sign Code and Challenged Provisions, 01–3039–CIV DE # 94, at 8–9.)

construction of billboards in certain areas throughout the City; namely, restricted commercial and residential zoning districts.[46]

With regard to whether an ordinance is content-based or content-neutral, the Supreme Court has stated as follows:

> The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is "justified without reference to the content of the regulated speech."

*Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (internal citations omitted)). Furthermore, the Eleventh Circuit has noted that in evaluating facial challenges to an ordinance, courts must attempt to construe any ambiguities "in a manner which avoids constitutional problems." *Southlake Prop. Assoc., Ltd. v. Morrow, Georgia*, 112 F.3d 1114, 1119 (11th Cir.1997) (citing *American Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir.1990)). In the following analysis, the Court evaluates each of National's arguments and finds that the City's Zoning Ordinance constitutes a constitutionally permissible content-neutral regulation intended to regulate structures rather than to suppress speech.

### 1. *Commercial Speech—Constitutionality*

■ In addition, National argues that this Court should strike down the Zoning Ordinance as an unconstitutional content-based regulation because of its different treatment of offsite and onsite commercial speech.[47] As the basis for this argument, National cites to provisions in the Ordinance that allow onsite commercial signs but prohibit offsite commercial signs.[48] *See supra* note 45 Specifically, National argues that because of the way the Ordinance defines "onsite" and "offsite" signs, this distinction results in greater protection being offered to onsite commercial signs, e.g., a drugstore advertising "Bayer Aspirin," as opposed to offsite commercial signs, e.g., a billboard above a drugstore advertising "Goodyear Tires."

A casual review of First Amendment precedent reveals the judicial consensus that commercial speech is not accorded the same level of protection as noncommercial speech. In *Ohralik v. Ohio State Bar Assn.*, the Supreme Court stated:

> To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate

**46.** (Aug. 28, 2002, Tr. of Prelim. Inj. Hr'g at 40:23–41:7.)

**47.** (Pl.'s Mem. In Supp. of Summ. J., 01–3039–CIV DE # 117, at 9.)

**48.** This Court would like to clarify that in light of *Southlake* and this Court's previous analysis, offsite signs by their very nature are commercial signs. *See* discussion *infra* Part V.B.2.a. However, in this section the Court will refer to offsite "commercial" signs for congruency with National's arguments and to avoid confusion.

with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Subsequently, the Court set forth the following four-part test for analyzing the validity of a governmental regulation of commercial speech: (1) the only commercial speech subject to protection is that which concerns lawful activity and is not misleading; (2) a valid regulation must assert a substantial governmental interest; (3) the regulation must directly advance the governmental interest asserted; and (4) the regulation is no more extensive than necessary to achieve that interest. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

A year later in *Metromedia,* the Supreme Court specifically addressed one of the questions National brings before this Court; namely, whether a city can constitutionally regulate commercial speech through an onsite-offsite distinction. 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800.

The ordinance in *Metromedia* permitted onsite commercial advertising,[49] "but other commercial advertising and noncommercial communications using fixed-structure signs [were] everywhere forbidden unless permitted by one of the specified exceptions."[50] *Id.* at 496, 101 S.Ct. 2882. The city's purpose in passing such an ordinance was to further "traffic safety and the appearance of the city." *Id.* at 507, 101 S.Ct. 2882. The plaintiff, a billboard company, challenged the ordinance on the grounds that it would eliminate the outdoor advertising business in San Diego and that this violated the First and Fourteenth Amendments. *Id.* at 503–04, 101 S.Ct. 2882

In addressing plaintiff's claims, the Court applied the four-prong *Central Hudson* test and stated that "[t]here can be little controversy over the application of the first, second, and fourth criteria." *Id.* at 507, 101 S.Ct. 2882. First, the Court indicated that there was no evidence that the commercial speech at issue was either misleading or involved unlawful activity *Id.* Next, the Court stated that there could not be "substantial doubt that the twin goals that the ordinance seeks to further—traffic safety[51] and the appearance of the

**49.** Onsite commercial advertising signs were defined as those "designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising foods manufactured or produced or services rendered on the premises upon which such signs are placed." *Metromedia,* 453 U.S. at 494, 101 S.Ct. 2882.

**50.** The ordinance set forth the following categories of signs as exceptions to the general prohibition: (a) government signs; (b) signs located at public bus stops; (c) signs manufactured, transported, or stored within the city, if not used for advertising purposes; (d) commemorative historical plaques; (e) religious symbols; (f) signs within shopping malls; (g) for sale and for lease signs; (h) signs on public transportation vehicles; (I) signs on commercial vehicles; (j) signs depicting time, temperature, and news; (k) ap-

proved temporary, off-premises, subdivision directional signs; (*l*) and "temporary political campaign signs." *Id.* at 494–95, 101 S.Ct. 2882.

**51.** In support of this conclusion, the Court cited to *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). In *Railway Express,* New York City passed a regulation banning advertising on vehicles. 336 U.S. at 107–108, 69 S.Ct. 463. The plaintiff, a national company that sold advertising space on the side of its trucks, argued that the regulation violated the equal protection clause of the Fourteenth Amendment. *Id.* at 109–10, 69 S.Ct. 463. In upholding the regulation on that ground, the Court upheld a local municipality's right to determine what constituted a traffic hazard. *Id.* at 109, 69 S.Ct. 463. Specifically, the Court stated that it was not the Court's "func-

city [52]—are substantial governmental goals." *Id.* at 507–08, 101 S.Ct. 2882. As to the fourth prong, the Court explicitly rejected the plaintiff's argument that the ordinance was overly broad, stating:

> If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its end: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs.

*Id.* at 508, 101 S.Ct. 2882.

Finally, the Court turned its analysis to the third prong, what is considered the "more serious question," and reasoned as follows:

> In the first place, whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the state objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is under-inclusive because it permits onsite advertising. Second, the city may believe that offsite advertising, with [its] period-

ically changing content, presents a more acute problem than does onsite advertising. Third, San Diego has obviously chosen to value one kind of commercial speech—onsite advertising more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interest in traffic safety and esthetics. The city has decided that in a limited instance—onsite commercial advertising—its interests should yield. We do not reject that judgment. As we see it, the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the product or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere. *It does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interests in this context that it must give similar weight to all other commercial advertising.*

---

tion to pass judgment on [the city's] wisdom. We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation had no relation to the traffic problem of New York City. It is the judgment of the local authorities that it does have such a relation. And nothing has been advanced which shows that to be palpably false." *Id.* (internal citations omitted). Moreover, the Court stated that even though the regulation did not ban all distractions, this omission did not invalidate it because "[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Id.* at 110, 69 S.Ct. 463 (citing *Central Lumber Co. v. South Dakota*, 226 U.S. 157, 160, 33 S.Ct. 66, 57 L.Ed. 164 (1912)).

**52.** In support of this conclusion, the Court referenced the following precedent: (1) *Penn*

*Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (reaffirming prior holdings that local governments may enact legislation intended to maintain the character and aesthetics of a municipality.); (2) *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (upholding an ordinance that restricted land use to one-family dwellings on the grounds that a city's police powers encompass maintaining esthetics and societal values.); (3) *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (holding that "[i]t is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.")

*Id.* at 511–12, 101 S.Ct. 2882 (emphasis added). Therefore, the Court held that "[i]n light of the above analysis, we cannot conclude that the city has drawn an ordinance broader than is necessary to meet its interest, or that it fails directly to advance substantial government interests. In sum, insofar as it regulates commercial speech the San Diego ordinance meets the constitutional requirements of *Central Hudson* ...." *Id.* at 511–12, 101 S.Ct. 2882.

Here, National seeks to divert this Court's attention from binding Supreme Court precedent laid out in *Metromedia* by arguing that the City's Zoning Ordinance fails to pass muster under the *Central Hudson* test in light of two recent Supreme Court opinions: *Edenfield v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) and *Greater New Orleans*

*Broad. Ass'n v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999).[53] First, National argues that pursuant to *Edenfield,*[54] the city's asserted interests in traffic safety and esthetics are not directly advanced by the Ordinance and therefore, do not meet the third prong of *Central Hudson* because the City "cannot justify [its] ban on offsite signs."[55] Next, National argues that pursuant to *Greater New Orleans,*[56] the City has not carefully calculated the costs and benefits associated with implementation of the Ordinance and, as such, the Ordinance does not satisfy the fourth prong of the *Central Hudson* test. (*Id.*)

However, after carefully analyzing *Edenfield* and *Greater New Orleans* in light of the facts of the instant case, this Court finds that National's reliance on those opinions is misplaced. The Supreme

---

**53.** (Pl.'s Mem. in Supp. of Mot. for Summ. J., 01–3039–CIV DE # 117, at 11.)

**54.** In *Edenfield,* the state passed legislation that banned in-person solicitation by certified public accountants ("CPAs"). 507 U.S. at 763, 113 S.Ct. 1792. In support of this ban, the state set forth two interests: (1) "protecting consumers from fraud or overreaching by CPA's," and (2) "maintain[ing] both the fact and appearance of CPA independence in auditing a business and attesting to its financial statements." *Id.* at 768, 113 S.Ct. 1792. The Court held that although these interests might be substantial interests, a complete ban on such solicitation did not meet the third prong of *Central Hudson;* namely, directly advancing those governmental interests. *Id.* at 770, 113 S.Ct. 1792. Specifically, the Court stated that the state had "not demonstrated that, as applied in the business context, the ban on CPA solicitation advances its asserted interests in any direct and material way." *Id.* 771, 113 S.Ct. 1792.

**55.** (*Id.* (citing *Edenfield,* 507 U.S. at 771, 113 S.Ct. 1792.))

**56.** In *Greater New Orleans,* the plaintiff challenged 18 U.S.C. § 1304 on First Amendment

grounds, 527 U.S. at 181, 119 S.Ct. 1923. Section 1304 effectively banned advertisements of private casino gambling broadcast by radio or television stations regardless of where the stations and/or casinos were located. *Id.* at 178–182, 119 S.Ct. 1923. In defending the constitutionality of Section 1304, the government identified the following interests advanced by that section: (1) "reducing the social costs associated with 'gambling' or 'casino gambling,'" and (2) "assisting States that 'restrict gambling' or 'prohibit casino gambling' within their own borders." *Id.* at 185, 119 S.Ct. 1923. In recognizing that these interests constitute substantial government interests, the Court noted that they are not self-evident as a result of "Congress' unwillingness to adopt a single national policy that consistently endorses either interest asserted by the Solicitor General." *Id.* at 187, 119 S.Ct. 1923. As a result, after applying the *Central Hudson* analysis, the Court struck down the statute as unconstitutional, and held that the government failed to show how the statute directly advanced its stated interests. *Id.* at 188–96, 119 S.Ct. 1923 In so holding, the Court noted that "[t]he operation of § 1304 and its attendant regulatory regime is so pierced by exemptions and inconsistencies that the government cannot hope to exonerate it." *Id.* at 190, 119 S.Ct. 1923.

Court struck down the legislation in those cases because either (1) the interests set forth were not directly advanced by the statute in question,[57] or (2) the statute was overly broad.[58] However, both cases are factually distinguishable from the instant case in that the government's asserted interests in those cases are unrelated to the interests the City of Miami asserts as justification for the Zoning Ordinance. *See supra* note 54; *See supra* note 56. Therefore, this Court finds that its application of the *Central Hudson* test must be guided by *Metromedia*, rather than *Edenfield* and *Greater New Orleans*, because the facts in *Metromedia* are parallel to the facts in this case.

Here, like in *Metromedia*, the City is enforcing an Ordinance that effectively bans offsite commercial speech while allowing onsite commercial speech in order to promote traffic safety and esthetics. National is arguing, like the plaintiff in *Metromedia*, that this disparity results in some commercial speech—onsite commercial—being favored over other commercial speech—offsite commercial. However, *Metromedia* explicitly held that this disparity is allowed. Yet, National reasserts the arguments set forth by the plaintiff and rejected by the Court in *Metromedia* that the Ordinance must be struck down as unconstitutional because it fails to pass muster under the third and fourth prongs of *Central Hudson.*

As to the third prong, National argues that the Ordinance does not directly advances its stated interests because the City has not provided evidence showing that billboards are connected to traffic safety and esthetics, or that offsite signs are

harmful at all. However, National fails to recognize that the reasoning in *Metromedia* explicitly rejects this argument. Here, among the 14 specified purposes of the Ordinance,[59] the City asserts a desire to ensure traffic safety and "provide a wholesome, serviceable, and attractive community." Miami, Fla., Zoning Ordinance § 120 (1991). Contrary to National's argument, this Court does not find that the City must conduct expensive research to conclude that offsite commercials signs pose a threat to traffic safety and esthetics. On the contrary, this Court hesitates, as the Supreme Court in *Metromedia* hesitated, to question or challenge the reasonable conclusion of the City's local legislators that offsite signs pose a threat to traffic safety. *See Metromedia*, 453 U.S. at 509, 101 S.Ct. 2882. Moreover, similar to the *Metromedia* Court, this Court finds that it is not unreasonable for those lawmakers to conclude that offsite signs in themselves constitute an esthetic harm wherever they are located or placed.[60] *See id.* at 510, 101 S.Ct. 2882. Therefore, this Court concludes that the Zoning Ordinance at issue directly advances the City's interests in maintaining traffic safety and esthetics by prohibiting offsite signs.

Finally, as to the fourth prong, this Court disagrees with National's argument that the Ordinance must indicate that the City carefully calculated the costs and benefits associated with prohibiting offsite signs. *See* discussion *supra.* The fourth prong of *Central Hudson* requires that the ordinance be no more extensive than necessary to achieve its interests. 447 U.S. at 566, 100 S.Ct. 2343. Here, the City of

---

57. *See supra* note 54.

58. *See supra* note 56.

59. *See supra* note 2.

60. In fact, the Eleventh Circuit in *Harnish v. Manatee County*, explicitly noted that *Me-*

*tromedia* and its progeny conclusively established that "[a]esthetics is a substantial governmental goal which is entitled to and should be accorded weighty respect." 783 F.2d 1535, 1539 (11th Cir.1986).

Miami has concluded that offsite signs pose a threat, and it has directly banned those signs. Following the Supreme Court's reasoning in *Metromedia*, this Court finds that the City's failure to also ban onsite commercial signs does not cause the Ordinance to be overly broad. On the contrary, the City of Miami, just like the city in *Metromedia*, has "gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs." *Metromedia*, 453 U.S. at 508, 101 S.Ct. 2882. Thus, this Court concludes that the Ordinance is no more extensive than necessary to achieve the City's stated purposes.

Accordingly, this Court finds that the Zoning Ordinance, as it relates to onsite-offsite commercial signs, is constitutional pursuant to the *Central Hudson* test because: (1) there is no evidence indicating that the commercial speech at issue concerns unlawful activity or is misleading; (2) the Ordinance asserts the substantial governmental interests of maintaining traffic safety and esthetics; (3) the Ordinance directly advances these governmental interests by banning offsite signs; and (4) the Ordinance is no more extensive than necessary to achieve the states interests even though it allows onsite signs.

### 2. The Zoning Ordinance does not unconstitutionally discriminate against noncommercial speech

■ This Court has clearly and unequivocally held that National does not have standing to assert a facial challenge to the provisions of the Ordinance that affect noncommercial speech, because it lacks a "substantial interest" in such speech. *See* discussion *supra* Part V.A.2. However, because of the lack of clarity in First Amendment case law, this Court has carefully analyzed the provisions of the Zoning Ordinance that affect noncommercial speech. After careful consideration, the Court concludes that those provisions of the Ordinance affecting noncommercial speech do not constitute an unconstitutional content-based restriction, rather the Ordinance is a content-neutral regulation that governs structures rather than restricts speech.

### a. Noncommercial Speech v. Commercial Speech

National claims that the City's Zoning Ordinance is an unconstitutional content-based regulation that favors commercial speech over noncommercial speech. In support of this argument, National cites to provisions in the Ordinance that allow onsite signs and prohibit offsite signs. *See supra* note 43. One of the provisions National is challenging regulates signs in the C–1 Restricted Commercial zoning district, and contains similar language as some of the other challenged provisions:

> Onsite signs only shall be permitted in these districts, subject to the following requirements and limitations. Except as otherwise provided, such signs may be illuminated but shall not be animated or flashing. At retail or service establishments, in addition to identifying the principal business, commodity or service, such signs may devote not more than half of their actual aggregate to the advertising of subsidiary products sold or services rendered on the premises.

MIAMI, FLA. ZONING ORDINANCE § 401 at 128. The Ordinance defines onsite signs as "[a] sign relating in its subject matter to the premises on which it is located, *or* to products, accommodations, services, or activities on the premises. Onsite signs shall not be construed to include signs erected by the outdoor advertising industry in the conduct of the outdoor advertising business." *Id.* § 2502 at 713 (emphasis added). Relatedly, the Ordinance defines off-

site signs as "[a] sign other than an onsite sign. The term includes, *but is not limited to,* signs erected by the outdoor.advertising industry in the conduct of the outdoor advertising business." *Id.* § 2502 at 712 (emphasis added).

The Eleventh Circuit has specifically considered whether an ordinance that prohibits offsite signs and allows onsite signs unconstitutionally discriminates against noncommercial speech. *Southlake,* 112 F.3d 1114. In *Southlake,* the plaintiff sought to erect four offsite outdoor advertising billboards in the City of Morrow. *Id.* at 1115. Morrow's sign ordinance prohibited billboards, defined as any "sign which advertises a commodity, product, service, activity or any other person, place, or thing, which is not located, found or sold on the premises upon which the sign is located." *Id.* at 1115, 1117. The plaintiff claimed that the ordinance was facially unconstitutional because (1) it impermissibly regulated commercial speech, and (2) it unconstitutionally burdened noncommercial speech through its onsite-offsite distinction. *Id.* at 1115.

In analyzing the plaintiff's claim, the Eleventh Circuit asserted that the onsite-offsite distinction in the commercial speech context is straightforward, readily ascertainable, and constitutional. *Id.* (citing *Metromedia,* 453 U.S. at 512, 101 S.Ct. 2882). On the other hand, the court noted that "[l]ocating the site of noncommercial speech ... is fraught with ambiguity" because "[n]oncommercial speech usually expresses an idea, an aim, an aspiration, a purpose, or a viewpoint. Where is such an idea located? What is the site upon which the aspiration is found?" *Id.* at 1119. In wrestling with this ambiguity, the court considered and unambiguously rejected

the First Circuit's reasoning in *Ackerley* that " '[t]he only signs containing noncommercial messages that are [onsite] are those relating to the premises on which they stand, which inevitably will mean signs identifying nonprofit institutions.' " *Id.* (quoting *Ackerley Communications of Mass., Inc. v. City of Cambridge,* 88 F.3d 33, 37 (1st Cir.1996)). The Eleventh Circuit noted that the *Ackerley* view unduly restricts onsite noncommercial speech to places where "some organized activity associated with the idea espoused is located or found." [61] *Id.* In fact, the court reasoned that application of the view espoused in *Ackerley* would mean that any ordinance prohibiting offsite signs would ban, with few exceptions, all noncommercial messages, and must then be declared void. *Id.* The court warned that this result is contrary to the well-established notion that when evaluating facial challenges to an ordinance, any ambiguities must be construed "in a manner which avoids any constitutional problems." *Id.* (citing *American Booksellers v. Webb,* 919 F.2d 1493, 1500 (11th Cir.1990) and *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 285 (5th Cir.1981)).

In evaluating the *Ackerley* view, the Eleventh Circuit concluded that "[t]here is ... no logical reason to interpret the ordinance as locating the expression of ideas, aspirations, and beliefs in this way." *Id.* at 1117. Instead, the Eleventh Circuit espoused its own alternative view and stated that "[a]n idea, unlike a product, may be viewed as located wherever the idea is expressed, i.e., wherever the speaker is located. Under this alternative view, *all noncommercial speech is onsite. A sign bearing a noncommercial message is onsite wherever the speaker places it.*" *Id.* at

---

**61.** The Eleventh Circuit noted that under this view "speech advocating racial bigotry is onsite at a Klavern of the Klan; 'Save the Whales' is onsite where Greenpeace has an office; and 'Jesus Saves' is displayed onsite only where a Christian religious organization is operating." *Southlake,* 112 F.3d at 1119.

1117–18 (emphasis added). The Eleventh Circuit then applied this alternative view to the Morrow ordinance and stated as follows:

> Although Morrow's definition of billboard does not explicitly exclude noncommercial speech it defines billboards as a sign containing an offsite message. Under the [Eleventh Circuit's] alternative view of the onsite-offsite distinction, a 'billboard' would not include a sign carrying a noncommercial message. Offsite noncommercial signs, therefore, would not be prohibited. This result is consistent with Morrow's enforcement of its ordinance.

*Id.* at 1119. Thus, the Eleventh Circuit upheld the Morrow ordinance, and reasoned that the onsite-offsite distinction does not impermissibly restrain noncommercial speech because "[t]he definition of billboard as an offsite advertising sign does not include noncommercial speech as such speech is onsite." *Id.*

National would like this Court to disregard the binding precedent set forth by the Eleventh Circuit in *Southlake,* and instead enter judgment as a matter of law for National pursuant to the First Circuit's rationale in *Ackerley* and three decisions [62] rendered by other judges in this district.[63] However, National fails to recognize that its reliance on *Ackerley* and the three district cases is misplaced. As explained above, the Eleventh Circuit has explicitly rejected the First Circuit's reasoning in *Ackerley* that noncommercial speech is almost always offsite, and instead unambiguously adopted the *opposite view* that all noncommercial speech is onsite. *Southlake,* 112 F.3d at 1118–19.

Moreover, National's reliance on Judge Middlebrooks's opinion, in *Florida Outdoor Adver., LLC v. Boynton Beach,* 182 F.Supp.2d 1201 (S.D.Fla.2001), Judge Ungaro–Benages's Omnibus Order in *Wilton Manors Street Sys. v. Wilton Manors,* No. 00–6186–CIV–UNGARO, 2000 WL 33912332 (S.D.Fla. Dec. 5, 2000), and Judge Zloch's Omnibus Order in *Coral Springs Street Sys. v. Sunrise, Florida,* No. 01–7951–CIV–ZLOCH, 2003 WL 22351111, —— F.Supp.2d —— (S.D.Fla. Feb.21, 2003), is also misplaced. In its current Motion, National argues that this Court should strike down the City's Zoning Ordinance as unconstitutional on the basis that Judges Middlebrooks, Ungaro–Benages, and Zloch, in cases dealing with sign codes "which contained very similar provisions to the City's Sign Code provisions at issue," found such codes to be facially unconstitutional.[64]

After reviewing of these opinions, this Court notes that not one of them references *Southlake,* perhaps because the parties failed to bring it to the courts' attention. Nonetheless, this Court concludes that clear and concrete parallels cannot be drawn between the sign codes in each of these cases and the Zoning Ordinance in the instant case.[65] Each sign code and

---

**62.** Judge Middlebrooks's opinion in *Florida Outdoor Adver., LLC v. Boynton Beach,* 182 F.Supp.2d 1201 (S.D.Fla.2001), Judge Ungaro–Benages's Omnibus Order in *Wilton Manors Street Sys. v. Wilton Manors,* No. 00–6186–CIV–UNGARO, 2000 WL 33912332 (S.D.Fla. Dec. 5, 2000), and Judge Zloch's Omnibus Order in *Coral Springs Street Sys. v. Sunrise, Florida,* No. 01–7951–CIV–ZLOCH, 2003 WL 22351111, —— F.Supp.2d —— (S.D.Fla. Feb.21, 2003)

**63.** (Pl.'s Mem. In Supp. of Mot. for Summ. J., 01–3039–CIV DE # 117, at 4 n. 7, 7–8.)

**64.** (Pl.'s Mem. In Supp. of Mot. for Summ. J., 01–3039–CIV DE # 117, at 5.)

**65.** Copies of the sign codes at issue in those cases are not attached to the opinions, and the exact language of the ordinance upon which the courts' conclusions are based is not included in the opinions. Therefore, this

zoning ordinance contains specific and precise language. In considering facial challenges to an ordinance, a court's interpretation of the ordinance's constitutionality, or lack thereof, turns on that language. When evaluating such challenges on First Amendment grounds, each court must render decisions on a case-by-case basis, after careful consideration of the specific provisions of the ordinance in question. As a result, this Court is not dissuaded from applying its own interpretation of *Southlake* to the facts of the instant case merely because Judges Middlebrooks, Ungaro–Benages, and Zloch (whose opinions in those cases make no reference to *Southlake*) found that the language of the individual sign codes in their cases violated the First Amendment.

Thus, contrary to National's contention, this Court must rely upon and apply the reasoning espoused in *Southlake* because the case is binding and directly on point in the instant case. Here, like the plaintiff in *Southlake*, National argues that the Zoning Ordinance is unconstitutional because its ban of offsite signs prohibits noncommercial messages from being displayed.[66] The Ordinance defines an offsite sign as "a sign other than on onsite sign." MIAMI, FLA., ZONING ORDINANCE § 2502 at 712. The definitions of onsite and offsite signs are ambiguous in that the signs are not qualified by their commercial or noncommercial nature. *See Id.* at 712, 713. However, according to the Eleventh Circuit's reasoning in *Southlake*, "all noncommercial speech is onsite." 112 F.3d at 1117–18.

Therefore, this Court finds that: (1) the Ordinance's ban against offsite signs cannot be read to mean that noncommercial messages are prohibited because noncommercial speech is always onsite; and (2) the definition of onsite signs can be read to include noncommercial messages, so that the provisions providing for "onsite signs only" specifically allow noncommercial messages. This construction interprets all ambiguities in a manner that avoids constitutional infirmities and as such is in accordance with the Eleventh Circuit's holding in *Southlake*. Accordingly, this Court upholds the Zoning Ordinance's prohibition of offsite signs because its onsite-offsite distinction does not unconstitutionally favor commercial speech over noncommercial speech.

### b. The Zoning Ordinance does not unconstitutionally discriminate between different types of noncommercial speech

In addition, National argues that the Zoning Ordinance is void because 57 different provisions throughout the Ordinance unconstitutionally favor some forms of noncommercial speech over others. *See supra* note 44. These provisions can be divided into two separate groups: (1) provisions regulating signs in the various zoning and special districts ("the regulations"), and (2) provisions exempting certain signs from the permitting process ("the exemptions").[67] *See infra* note 71.

---

Court is not able to make a comparison between the exact language of those codes and the Ordinance in the instant case.

**66.** (Pl.'s Mem. In Supp. of Mot. for Summ. J., 01–3039–CIV DE # 117, at 4–6.)

**67.** Because National's current action presents a facial challenge on First Amendment grounds to the City's Zoning Ordinance, this

Court has specifically referred to each of the challenged provisions. A review of the provisions regulating signs in the various districts reveals that the language of those provisions is repetitive throughout the Ordinance for the different districts. Therefore, this Court will specifically address and analyze the regulations for the C–1 district as representative of those provisions for the sake of clarity and to avoid repetition.

**(i)** ***The regulations do not unconstitutionally favor different types of noncommercial speech***

National cites *Metromedia* in support of its challenge to the regulations. However, the facts and holding of *Metromedia* are easily distinguishable from the instant case. As discussed above, the ordinance in *Metromedia* prohibited all offsite noncommercial messages, but delineated 12 specific exceptions.[68] 453 U.S. at 494–96, 514, 101 S.Ct. 2882. The Supreme Court found the exceptions unconstitutional. *Id.* at 514, 101 S.Ct. 2882. In so doing, the Court noted that except for the 12 types of signs specifically allowed, "[n]o other noncommercial or ideological signs meeting the structural definition [were] permitted, regardless of their effect on traffic safety or esthetics." *Id.* Thus, the Court held that the ordinance violated the First Amendment because "[a]lthough the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests." *Id.* at 514, 101 S.Ct. 2882.

Here, unlike in *Metromedia*, the Ordinance does not specifically ban noncommercial speech. On the contrary, in light of *Southlake*, the Ordinance's allowance of onsite signs specifically provides for noncommercial messages. *See supra* Part V.B.2.a. Nevertheless, the City may constitutionally limit the size and placement of sign *structures* so long as the signs are not restricted based on their content or viewpoint. This Court has carefully reviewed the challenged provisions and concludes that the provisions regulating sign structures in the various districts (i.e., section 401 and Article 9) are content-neutral zoning regulations intended to regulate structures, rather than to suppress speech. The C–1 Restricted Commercial district is one of the numerous zoning districts that is regulated by the provisions set forth in section 401.[69] In the C–1 district sign

---

**68.** *See supra* note 50.

**69.** The Ordinance sets forth the following sign regulations for the C–1 Restricted Commercial district:

Onsite signs only shall be permitted in these districts, subject to the following requirements and limitations. Except as otherwise provided, such signs may be illuminated but shall not be animated or flashing. At retail or service establishments, in addition to identifying the principal business, commodity or service, such signs may devote not more than half of their actual aggregate to the advertising of subsidiary products sold or services rendered on the premises.

1. Community or neighborhood bulletin boards or kiosks shall be permissible as provided at section 925.3.10.

2. Construction signs; not be [to] exceed one (1) construction sign or thirty (30) square feet in area, for each lot line adjacent to a street.

3. Development signs, except where combined with construction signs, shall be permissible only by Class I Special Permit as provided at section 925.3.8.

4. Directional signs, which may be combined with address signs but shall bear no advertising matter, may be erected to guide to entrances, exits, or parking areas, but shall not exceed five (5) square feet in surface area.

5. Ground or freestanding signs, limited to one (1) sign structure with not to exceed two (2) sign surfaces, neither of which shall exceed forty (40) square feet in sign area, for each establishment or for each fifty (50) feet of store frontage. Permitted sign area shall be cumulative, but no sign surface shall exceed one hundred (100) square feet. Maximum height limitation shall be twenty (20) feet including embellishments, measured from the crown of the nearest adjacent local or arterial street, not including limited access highways or expressways, provided, however, that the zoning administrator at his discretion may increase the measurement of the crown by up to five (5) feet to accommodate unusual or undulating site conditions.

6. Marquee signs, limited to one (1) per establishment and three (3) square feet in area.

structures have certain height, square footage and placement requirements. *See supra* note 54. There is no indication that the challenged portions of section 401 and Article 9 restrict the content of the sign structures. Therefore, unlike the exceptions in *Metromedia,* the challenged provisions in this case do not exempt certain signs from an otherwise total ban.

In further support of this challenge to the regulations, National targets the provisions of the Ordinance relating to the temporary placement of political and civic campaign signs. National argues that it is unconstitutional for the Ordinance to allow those signs but disallow other noncommercial messages. However, this Court does not interpret the Ordinance to mean that temporary political and civic campaigns signs are the only noncommercial signs allowed in those districts. Instead, the Ordinance merely requires removal of such signs upon the conclusion of the relevant election. Therefore, this Court finds that these provisions restrict rather than empower speech related to political and civic campaigns by requiring their prompt removal at a certain point in time.

Even though this interpretation of the provisions now appears to restrict political speech, at least two courts have held that a city may constitutionally set a reasonable time limit for residents to remove election-related signs after the conclusion of an election. *Granite State Outdoor Adver.,* 213 F.Supp.2d at 1337; *see also Collier v. City of Tacoma,* 121 Wash.2d 737, 854 P.2d 1046, 1057 (1993). This finding is justified by the fact that political and civic campaign signs cease to exist as speech at the conclusion of the election.[70] Therefore, cities may constitutionally enforce such removal requirements in order to advance esthetic interests, which is exactly the case here.

Accordingly, this Court finds that the provisions regulating signs in the various zoning districts (e.g., section 401 and Article 9) do not unconstitutionally favor commercial over noncommercial speech.

7. Projecting signs (other than marquee signs) shall be limited to one (1) sign structure with not to exceed two (2) sign surfaces, neither of which shall exceed forty (40) square feet in sign area; provided, however, that such permissible sign area shall be increased in C–1 districts to eighty (80) square feet where maximum projection from the face of the building is two (2) feet or less, sixty (60) square feet where projection is more than two (2) and less than three (3) feet, and forty (40) square feet where projection is at least three (3), but not more than four (4) feet.

8. Real estate signs, limited to one (1) per street frontage and not to exceed half the area permissible for the same type of permanent sign on the premises.

9. Temporary civic and political campaign sins are allowed, subject to the exceptions, limitations and responsibilities of subsections 925.3.11, 925.3.12 and 925.3.13 respectively.

10. Wall signs, limited to two and one-half (2½) square feet of sign area for each lineal foot of wall fronting on a street is any portion of such sign is below fifteen (15) feet above grade. For each foot that the lowest portion of such sign exceeds fifteen (15) feet, permitted sign area shall be increased one (1) percent. Not more than three (3) such signs shall be permitted for each frontage on which area calculations are based, but one (1) of these may be mounted on a side wall.

11. Window signs, painted or attached, shall not exceed twenty (20) percent of the glassed area of the window in which placed. Number of such signs is not limited by these regulations, but aggregate area shall be included as part of aggregate wall sign area, as limited above.

MIAMI, FLA. ZONING ORDINANCE § 401 at 128–28.

70. Signs supporting particular campaigns during an election must be displayed during a specified and limited time period, otherwise the message is no longer protected speech because it loses its purpose (e.g., displaying a "Clinton/Gore '96" Election sign in 1997).

### (ii) The exemptions do not unconstitutionally express a preference for certain types of noncommercial speech over others

National cites the exemption provisions [71] to support its argument that the Ordinance favors some noncommercial messages over others. However, binding Eleventh Circuit precedent requires the Court to reject this argument. In *Messer v. City of Douglasville,* the Eleventh Circuit upheld a permit exemption scheme [72] that was very similar to the scheme at issue in this case. 975 F.2d 1505, 1511 (11th Cir.1992). In that case, the plaintiff argued that, as in *Metromedia,* "the [Douglasville] ordinance distinguishe[d] between different types of noncommercial messages, and *exempt[ed] certain noncommercial messages from permitting requirements* based on their content, resulting in an unconstitutional content-based restriction on the noncommercial messages not so exempted." *Id.* at 1512 (emphasis added). In analyzing the plaintiff's argument, the court noted that in *Metromedia* the "plurality struck the San Diego ordinance because it had a system of exceptions to the general ban on non-commercial billboards which violated the First Amendment." *Id.* at 1512. However, the court distinguished the exemptions in *Messer* by

stating that "the Douglasville exemptions are not exemptions from a general ban of all off-premise billboards, but from permitting requirements and permits fees." *Id.* at 1513. Moreover, the court stated that the exemptions do not express a preference between different types of noncommercial messages, and in fact "favor[ ] noncommercial over commercial messages by expressly deregulating messages by noncommercial speakers." *Id.* Here, like the ordinance in *Messer,* exemption from the permitting process does not constitute an exception to a general ban of noncommercial messages. *See supra* note 71. Therefore, in accordance with *Messer,* this Court rejects National's arguments with regard to all but one of the permit exemptions.

The lone permit exemption not explicitly protected by *Messer* is the exemption for temporary political and civic campaign signs. [73] *See supra* note 71. Political speech lies at the core of the First Amendment and is afforded its broadest protection. *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346–47, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)); *see also Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). To re-

---

**71.** Section 925.3 exempts the following signs from permit requirements: (1) government signs; (2) national flags and flags of political subdivisions; (3) decorative flags, bunting, decorations; (4) symbolic flags, award flags, house flags; (5) address, notice, directional and warning signs; (6) vehicle signs; (7) real estate signs; (8) certain construction and development signs; (9) balloons; (10) signs posted on community or neighborhood bulletin boards or kiosks; (11) temporary civic campaign signs; (12) temporary political campaign signs; (13) cornerstones, memorials, or tablets; (14) mailboxes; (15) signs on bus shelters, benches, trash receptacles; (16) weather flags; (17) church identification signs; (18) freestanding perimeter wall signs identifying developments.

**72.** The Douglasville ordinance exempting the following signs from the permitting process: "1) wall sign per building side announcing the business and attached to the side of the building, 2) one real estate "for sale" sign per property frontage, 3) one bulletin boards located on religious, public, charitable or educational premises, 4) one construction identification sign, and 5) directional traffic signs containing no advertisements." *Messer,* 975 F.2d at 1511.

**73.** None of the exemptions at issue in *Messer* addressed political, historical or religious signs. 975 F.2d at 1513.

quire permits for campaign related signs would ignore the substantial time pressure that pervades every campaign. Thus, it is only by allowing this speech to appear in an accelerated fashion that the Ordinance is able to give such speech the protection it warrants. Had the City required permits for these temporary signs, citizens would undoubtedly have sued the City for violating their First Amendment rights to political speech. If this Court accepts National's argument and strikes the permit exemption for temporary political and civic campaign signs, the Ordinance would accord First Amendment rights less protection, not more.

Accordingly, this Court finds that the permit exemption scheme as set forth in the Ordinance does not unconstitutionally favor some forms of noncommercial speech over other. Rather, the Ordinance as it now stands gives the core of First Amendment speech the protection it deserves.

### 3. The Ordinance is a constitutional content-neutral zoning ordinance intended to regulate structures, not speech

■ National argues that this Ordinance must be struck down as an unconstitutional content-based restriction on speech pursuant to the Supreme Court's reasoning in *Metromedia*, the seminal case involving First Amendment issues and billboard signs. This Court disagrees. There is no question that First Amendment precedent, including *Metromedia*, clearly establishes the general rule that the government cannot "regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Taxpayers for Vincent*, 466 U.S. at 804, 104 S.Ct. 2118. However, this general rule is not applicable in cases where "there is not even a hint of bias or censorship in the [c]ity's enactment or enforcement of [the] ordinance." *Id.* This is particularly true where "[t]he text of the ordinance is neutral-indeed it is silent-con-

cerning any speaker's point of view ...." *Id.* Instead, such viewpoint neutral ordinances must be evaluated pursuant to the framework set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and reaffirmed in *Taxpayers for Vincent*, 466 U.S. at 804–05, 104 S.Ct. 2118, a post-*Metromedia* opinion. In *O'Brien*, the Court held that a viewpoint-neutral ordinance is constitutional if: (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) any incidental restriction on First Amendment rights is no greater than what is essential to further that interest. 391 U.S. at 377, 88 S.Ct. 1673.

After carefully considering each of National's arguments, this Court concludes that the City's Zoning Ordinance constitutes a content-neutral regulation intended solely to regulate structures, not to suppress speech. Here, the language of the Ordinance sets forth specific objectives the City set out to attain through its implementation. The Ordinance delineates the different zoning regulations applicable in each district and the various zoning procedures and processes governing application of those regulations. Thus, in light of the previous in-depth analysis, this Court finds that none of the provisions express even a hint of viewpoint bias or discrimination, and therefore the Ordinance constitutes a content-neutral regulation.

Moreover, the Ordinance passes constitutional muster under the *O'Brien* test as a content-neutral regulation. First, there is no question that the City can constitutionally enact and enforce a zoning ordinance intended to regulate land use within its boundaries. Next, the previous analysis clearly establishes that the second and third prongs of the *O'Brien* test are satis-

fied. *See* discussion *supra* Parts V.B.1–2. Specifically, the City has a substantial interest in maintaining traffic safety and promoting aesthetics and these interests are entirely unrelated to the suppression of speech.[74] *See Metromedia,* 453 U.S. at 507–08, 101 S.Ct. 2882; *see also supra* note. Moreover, by regulating the size, placement, and structural requirements of buildings and sign structures, the City is directly advancing those interests that are entirely unrelated to the suppression of speech. Finally, this Court finds that the effect that the Ordinance does have on speech, particularly offsite commercial speech, is no greater than necessary to accomplish the City's purposes. The City has determined that offsite billboards constitute a traffic safety hazard and an esthetics problem in specified zoning districts throughout the City of Miami. The Supreme Court in *Metromedia* clearly held that a city has a right to arrive at such conclusion. 453 U.S. at 511–12, 101 S.Ct. 2882. Here, the tangible medium of expression (i.e., billboards), rather than the content of the billboard, is what constitutes the problem. Thus, the provisions in the Ordinance that prohibit such billboards in certain areas aim only to promote the City's interests in traffic safety and esthetics, and are no broader than necessary to achieve that end. *See supra* Part V.B.3. The City has determined that its interests should yield only to onsite commercial speech and noncommercial speech, and the Supreme Court has condoned such a determination. *See Metromedia,* 453 U.S. at 511–12, 101 S.Ct. 2882. Accordingly, this Court finds that the Zoning Ordinance constitutes a constitutional content-neutral zoning regulation.

### 4. National's challenge that the Ordinance lacks procedural safeguards

Lastly, National argues that the Ordinance is a classic speech licensing scheme that must be struck down as unconstitutional because it lacks (1) clarity with regard to the discretion of the City officials, and (2) the necessary procedural safeguards set forth in *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).[75] In *Freedman,* the Supreme Court struck down a state law that required motion pictures to obtain a license prior to release. 380 U.S. at 58, 85 S.Ct. 734. The Board that issued the licenses had the exclusive authority to deny a license on the basis that the film was "obscene" or " 'tend[ed], in the judgment of the Board, to debase or corrupt morals or incite to crimes.' " *Id.* at 58, n. 2, 85 S.Ct. 734. In that case, the Court explicitly held that for such a speech licensing scheme to be constitutional, it must have the following procedural requirements in place: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (citing *Freedman,* 380 U.S. at 58–60, 85 S.Ct. 734.) However, in *Thomas v. Chicago Park Dist.,* the Supreme Court clearly stated that the stringent requirements set forth in *Freedman* do not apply when a permit scheme is content-neutral because such schemes are less threatening to the First Amendment. 534 U.S. 316, 122 S.Ct.

---

74. This Court finds that the City's purpose as clearly expressed in section 120 of the Ordinance is completely unrelated to the suppression of speech. *See supra* note 2. Moreover, this record is devoid of any evidence showing that the Ordinance as applied is intended to suppress speech.

75. (Pl.'s Mem. In Supp. of Mot. for Summ. J. 01–3039–CIV DE # 117, at 12–16.)

775, 779, 151 L.Ed.2d 783 (2002). Instead, the Court held that for such a scheme to be constitutional, it need only (1) limit the discretion of the licensing officer, and (2) render that decision "subject to effective judicial review." *Id.* at 780 (citing *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 95 L.Ed. 267 (1951)).

Here, the Ordinance at issue is a content-neutral zoning regulation that regulates structures, not speech. *See supra* Part V.B.3. Its permit scheme aims to enforce the various structural requirements (e.g., height, lighting, square footage, etc.) set forth in the Ordinance, but does not regulate the speech that can be displayed on structures on the basis of its content or specific viewpoint. Thus, contrary to National's assertion, the Ordinance need not satisfy the very stringent *Freedman* requirements.

■ In light of this distinction, the Ordinance contains sufficient procedural requirements to survive constitutional review. First, City officials cannot exercise unbridled discretion. On the contrary, an official's decision to either grant or deny a permit is expressly limited by the requirements set forth in the Ordinance. MIAMI, FLA., ZONING ORDINANCE §§ 2101.2, 2102.2, at 607–08. Specifically, an official may only deny a permit to build a structure if the structure fails to meet the concrete and specific requirements clearly set forth in the Ordinance for that specific zoning district. *Id.* Officials have no discretion to deny a permit if those specific requirements are met. *Id.* Moreover, the Ordinance also provides for effective judicial review of a City official's decision to either grant or deny a permit. *Id.* §§ 1800–1807 at 557–58. Under the Ordinance, if a permit is denied, the affected applicant may appeal to a zoning board that must grant a hearing within 45 days of the appeal. *Id.*

§ 1804 at 557. Thereafter, the board's decision itself may be appealed to the city commission, and ultimately, to the Florida courts. *Id.* §§ 2001–2005 at 591. Moreover, in order to assure adequate appellate review, the city official must give specific reasons for the permit denials. *Id.* § 2102.2 at 608.

For these reasons, the Zoning Ordinance's content-neutral permit scheme is constitutional pursuant to *Thomas.* Accordingly, the Court rejects National's argument that the Ordinance constitutes an impermissible speech licensing scheme. Instead, the Court finds that the Zoning Ordinance is a content-neutral permit scheme that adequately protects the First Amendment rights of all permit applicants.

## VI. Conclusion

The Supreme Court has clearly stated that while billboards constitute "a well-established medium of communication, used to convey a broad range of different kinds of messages," the fact remains that "whatever its communicative function, the billboard remains a 'large, immobile, and permanent structure which like other structures is subject to ... regulation.'" *Metromedia,* 453 U.S. at 501, 502, 101 S.Ct. 2882 (quoting *Metromedia v. San Diego,* 26 Cal.3d 848, 870, 164 Cal.Rptr. 510, 610 P.2d 407 (Cal.1980)). Once the dust surrounding National's First Amendment claims settles, it becomes clear that this case concerns one thing: National's commercial interest. This Court thinks that it would be counterintuitive to adopt National's position and issue a ruling intended to benefit and protect noncommercial speech, when its effect would actually be to benefit a billboard company whose sole interest and motivation in initiating this litigation is to ensure its commercial well-being.

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that National's Second Motion for Summary Judgment (DE # 116) be, and the same is hereby, DENIED. It is further

ORDERED and ADJUDGED that the City's Second Motion for Summary Judgment (DE # 112) be, and the same is hereby, GRANTED.

## FINAL JUDGMENT

Pursuant to Fed.R.Civ.P. 58, and the Court's September 25, 2003 Memorandum Opinion Granting Summary Judgment, it is

ORDERED and ADJUDGED that judgment is entered in favor of Defendant City of Miami and against Plaintiff National Advertising Company. This case is DISMISSED with prejudice. It is further

ORDERED and ADJUDGED that any pending motions are hereby DENIED as moot. The Court retains jurisdiction of the above-styled action to determine fees, costs, and expenses, as are appropriate under the law, incurred by Defendant in defending this action.